UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                           :

UNITED STATES OF AMERICA,            :

        - v. -                      :      08 Cr. 850 (JGK)

RAFFAELLO FOLLIERI,            :

             Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **GOVERNMENT'S SENTENCING MEMORANDUM**

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York

Reed M. Brodsky
Assistant United States Attorney
        -Of Counsel-

## TABLE OF CONTENTS

**Relevant Facts**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.  Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Follieri's Arrest and Guilty Plea. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Discussion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.  Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II. Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

  A.  Nature and Circumstances of Follieri's Crimes. . . . . . . . . . . . . . . . . . . . . . . . . 16

  B.  History and Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    1. Follieri's Character and Motives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    2. Follieri's Charitable Organization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    3. Follieri's Family Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    4. Follieri's Deportation to Italy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    5. Follieri's Vatican Connections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    6. Follieri's Awards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

  C.  Application of the Sentencing Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    1. Losses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    2. Misrepresentation of a Religious Organization. . . . . . . . . . . . . . . . . . . . . . 25

    3. Acceptance of Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  D.  The Need To Afford Adequate Deterrence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  E.  The Need To Avoid Unwarranted Sentence Disparities. . . . . . . . . . . . . . . . . . . 26

**Conclusion**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

UNITED STATES OF AMERICA,        :
                               :

      - v. -                   :      08 Cr. 850 (JGK)
                               :

RAFFAELLO FOLLIERI,          :
                               :

              Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of Raffaello Follieri, currently scheduled for October 23, 2008 at 2:30 p.m., and in response to Follieri's memorandum dated October 14, 2008 (cited herein as "Follieri's Memo."). Although the United States Probation Office recommended a sentence of 97 months in prison for Follieri, the Government stands by its plea agreement and for the reasons explained herein respectfully asks the Court to sentence Follieri within the Guidelines Range of 51 to 63 months.

From at least May 2005 through June 2007, Follieri repeatedly duped investors into believing that he had a special relationship with the Vatican that gave him access to church properties at below-market values, lied to investors about how he spent their money, stole their money, misused their money to live a lavish lifestyle, and covered up his crimes when confronted by investors.  At the time Follieri pled guilty, the Government's investigation concluded that the following were victims of Follieri's illegal schemes: (1) the New York State Common Retirement Fund ("NY Retirement Fund"); (2) the California Public Employees' Retirement Fund ("CalPERS"); (3) the California Teachers' Retirement Fund ("CalSTERS"); (4) F.B. Heron Foundation; (5) The Yucaipa Companies, LLC; and (6) Monsignor George Tomichek.

Follieri was motivated by greed.  He used his considerable charm and skill to trick people into giving him their money.  Follieri shamelessly told investors that the Catholic Church was vulnerable as a result of its financial obligations arising out of the sexual abuse lawsuits against the church while simultaneously misrepresenting that his connections with the Vatican enabled him to obtain special and exclusive access to church properties at cheap values.  While Follieri told representatives of the Catholic Church in the United States and elsewhere that he had the best of intentions in purchasing the properties, Follieri simultaneously told investors that he planned to develop and sell the properties for substantial profits.  As he cheated and stole from investors, Follieri flaunted his fraudulently obtained wealth by living a life of excess, which helped him maintain and further develop a false image of success.  To accomplish his schemes over such a long period of time, Follieri told many lies to many people.  He lied about his family history; he lied about his education and background; he lied about his work experience and finances; he lied about his connections; he lied about having a role at the Vatican; he lied about his use of investor money; he lied about his charitable foundation; and he lied about his good intentions.  It was only when he was arrested that Follieri's tangled web of lies unraveled and came to an end.

**Relevant Facts**

**I.     Background**

In or about 2003, Follieri came to the United States in search of success and money.  As one witness told the Government, Follieri tried to start up a business called "Beauty Planet" in New York while sleeping on the couch of a friend.  Although Follieri bragged to others that Beauty Planet had been a successful business in Europe, according to witnesses and records, Beauty Planet was a failure and declared bankruptcy before Follieri arrived in New York to start it up again.  When Beauty Planet also failed to go anywhere in New York, Follieri came up with the idea of selling his family's purported connections with the Vatican to obtain investor money to purchase Catholic Church properties at below-market values.  In or about 2004, along with his father (Pasquale Follieri), Follieri created the Follieri Group.  Follieri and his father represented that this group was a real estate development company designed to purchase and develop Catholic Church properties.

By in or about May 2005, the Follieri Group was failing.  It had not purchased properties from the Catholic Church, despite telling investors that its close connections with the Vatican would enable Follieri to obtain properties at below-market values.[1]  The Follieri Group's bank account was down to its last few dollars.  It was about this time that Follieri became acquainted with certain people who introduced him to the Yucaipa Companies ("Yucaipa").  Follieri took advantage of this opportunity—he lied.  In deceiving Yucaipa's representatives, Follieri deceived

---

[1]     The Government's investigation into Follieri's conduct prior to in or about May 2005 in connection with obtaining money from investors was not complete at the time of Follieri's guilty plea.  For this reason, the Government is not asking the Court to consider that conduct in determining Follieri's sentence and the Government did not include any potential losses prior to May 2005 in its calculation of the loss amounts in the Plea Agreement.

Yucaipa and the pension funds who contributed most of the capital to the venture partnership with Follieri.

To convince Yucaipa and those who provided money to Yucaipa to give him millions of dollars, Follieri first created a fictitious story about his life, his education, and his work experience. As advertised during the relevant period of the conspiracy on Follieri Group's website, Follieri's father was the "President" of the company, and Follieri was the "Chairman and Chief Executive Officer." (Gov't Exh. 1.) Follieri lied about his background and wealth. Follieri claimed that he and his father were executives and owners of EFFE Holdings, which Follieri asserted was a London-based investment firm that "purchases large real estate packages from government holdings in Europe and the Middle East," "is also active in oil trading as well as gold and diamond mining," has "mining operations in Gambia, Senegal, and Angola," and has an Italian subsidiary that manages "a multi-billion dollar foreign investment fund." (Gov't Exh. 1 at 3.) These were lies. (*See*, *e.g.*, Gov't Exh. 2.) They were designed to falsely lure investors into believing that the Follieri family was extremely wealthy with extraordinary access and connections in Italy. In reality, Follieri, and others known and unknown, used the Follieri Group to obtain and then misuse investor money for greed.

On his website, Follieri made the following additional misrepresentations about his background:

- Follieri falsely claimed that "[a]fter studying Italian literature at the Liceo Classico, he earned his Bachelor's Degree in Law and Economics at La Sapienza, the University of Rome." (Gov't Exh. 1 at 2.) By Follieri's own admission to the Probation Department in the Pre-Sentence Investigation Report ("PSR"), he never graduated from the University of Rome: "He studied law and dropped out because his father was having legal problems and because Follieri wanted to start his own business." (PSR ¶ 61).

4

- Follieri falsely claimed that "[f]ollowing the tremendous success of Beauty Planet S.R.L., Mr. Follieri formed Beauty Planet, North America.  Mr. Follieri sold the company in late 2002 to serve as Executive Vice President of EFFE Holdings, a London based, privately held investment firm." (Gov't Exh. 1 at 3.)  In reality, Beauty Planet was not a success in Europe, and Follieri was in New York in 2003 attempting to start up Beauty Planet, not 2002.  When that company also failed in New York, Follieri moved quickly to form the Follieri Group with his father. Indeed, Follieri told Probation that "[f]rom 2001 until 2002, Follieri was reportedly the CEO of Beauty Planet Cosmetics Company, located in Foggi[a], Italy.  He reported[ly] liquidated this company in order to move to the U.S. and we were requested not to inquire about Follieri's salary." (PSR ¶ 64.)  Follieri lied to people that he sold the Beauty Planet for approximately $35,000,000.

Follieri also claimed that he came from a family of billionaires, and that his family invested millions of dollars of their own money in the Follieri Group.  The bank records of the Follieri Group, however, reflect that all the money that was invested in that company from its inception came from people other than Follieri and his family, and that Follieri and others spent hundreds of thousands of dollars of investor money on their personal lifestyle rather than the business.[2]

At the outset, Follieri misrepresented to Yucaipa the nature and significance of Follieri's connections with the Vatican and what those connections were able to obtain for him.  Follieri showed at least one representative of Yucaipa, and other people, a phony letter in Italian purportedly written in or about 2002 by the late Pope John Paul II to Follieri.  Follieri told Yucaipa and others that this letter granted Follieri the authority to represent the Vatican in the

---

[2]     Follieri told the Probation Department that he dropped out of college because, among other things, "his father was having legal problems." (PSR ¶ 61).  The Government understands from newspaper accounts and other sources of information that, in or about 2005, at the same time that Follieri and his father obtained significant funds from pension funds, Yucaipa, and a charitable organization, Follieri's father was found guilty of embezzling thousands of dollars from a bankrupt company in Italy and received a three-year commuted sentence.  Follieri should not be punished based on the misconduct of his father in Italy.  However, his father's conduct is relevant in considering that when Follieri engaged in the deception and chicanery that led to his guilty plea in this case, Follieri was well aware of the criminal consequences of embezzlement and failed to learn from the lessons of what happened to his father.

United States for a five-year period in connection with the Follieri Group's efforts to purchase Catholic Church properties. For a variety of reasons, including his false image of being a successful businessman and fabricated story of coming from a family with international real estate holdings, people believed Follieri's claims about his relationship with and authority from the Vatican. However, Follieri's claims, including his letter from Pope John Paul II, were entirely false. Follieri lied when he told Yucaipa and others that his connections with the Vatican enabled him to obtain exclusive access to Catholic Church properties and purchase them at below-market values.

During the course of the conspiracy through June 2007, Follieri further elaborated and exaggerated his connections with the Vatican to make sure that Yucaipa and its investors continued to provide him with money. At various times, Follieri falsely asserted that he had been appointed as the Chief Financial Officer of the Vatican, that he had a formal role at the Vatican, that he managed investments on behalf of the Vatican, that he met with the Pope when he visited Rome, and that he was speaking with executives at the Vatican in connection with his bids to purchase church properties.

In reality, Follieri created the false impressions that he had ties to the Vatican, which enabled him to obtain church properties at below-market values, through his relationship with (a) Andrea Sodano, the nephew ("Nephew") of the then-Secretary of State of the Vatican Cardinal Angelo Sodano, (b) a clerical employee who ran errands at the Vatican, (c) two monsignors who traveled with him when visiting church officials in the United States and elsewhere, and (d) making unauthorized donations to the Vatican with investor money. Follieri misused investor funds to pay the Nephew for "engineering" services that the Nephew never

6

performed so that the Nephew could travel with Follieri when visiting church officials and help Follieri obtain access to the grounds of the Vatican.  It was through this connection that Follieri was able to attend one of the Pope's services and, along with many others, get his picture taken with the Pope.  (*See* Follieri Memo. at Exh. I).  Follieri also misused investor funds to pay the clerical employee to arrange for meetings with members of the clergy around the world, show the private gardens of the Vatican to Follieri's friends and associates, and arrange for guided tours of a museum at the Vatican.  Perhaps Follieri's most deceptive act was using the services of two monsignors to travel around with him to create the false impression that he came with the blessing of the Catholic Church.  Follieri also made donations to the Vatican using investor money without the knowledge and approval of investors—a good example being his donation of 20,000 Euros to Monsignor Carru at the Vatican, as reflected in a letter taken from Follieri after his arrest.  (Gov't Exh. 3).

Follieri's fraudulent claims relating to the Vatican kept his scheme going for a while before it collapsed under the weight of his lies.  That is because Follieri made false promises that he could not keep.  In reality, Follieri did not have exclusive access to the Catholic Church properties; he did not have the right of first refusal to purchase any properties; and he did not have the right to obtain them at below-market rates.  The various dioceses throughout the country sold properties to the highest bidder.  Indeed, despite submitting bids on properties, Follieri lost several auctions of church properties to other competing real estate companies.

In addition to witnesses, a significant document that helped prove that Follieri lied about his connections with the Vatican came from a letter that special agents of the Federal Bureau of Investigation ("FBI") seized (pursuant to a search warrant) in Follieri's safe following his arrest.

During the heart of the conspiracy, on or about March 6, 2006, Cardinal Sodano wrote a letter to Follieri from the Vatican, directing Follieri to stop misrepresenting that his company had ties to the Vatican simply because Follieri had hired the professional services of Cardinal Sodano's Nephew.  (Gov't Exh. 4).  Cardinal Sodano wrote:

> I feel it is my duty to tell you how perturbed I am to hear that your company continues to occasionally present itself as having ties to "the Vatican," due to the fact that my nephew, Andrea, has agreed on some occasions to provide you with professional consulting services.
>
> I do not know how this distressing misunderstanding could have occurred, but it is <u>necessary</u> now to avoid such confusion in the future.

(Gov't Exh. 4) (emphasis in original).  Despite that express warning, Follieri did not stop making false and misleading representations about his relationship with the Vatican.  In fact, after receiving the letter, Follieri deliberately magnified his prior misrepresentations by claiming that he held a formal position at the Vatican that was the equivalent of the chief financial officer.

Follieri's misrepresentations worked.  In or about June 2005, Yucaipa agreed to start a real estate venture partnership with Follieri called Follieri Yucaipa Investments LLC.  Most of the money that funded this partnership came from CalPERS, CalSTERS, and the NY Retirement

Fund.  Indeed, during the relevant time period, the financial contributions to Follieri Yucaipa

Investments LLC were as follows:

| Contribution | 8/31/05 | 12/01/05 | 6/09/06 | 12/04/06 | Percentage |
|---|---|---|---|---|---|
| CalPERS | $2,207,792 | $8,138,528 | $2,749,783 | $2,090,390 | 34.6% |
| NY Retire. | $2,207,792 | $8,138,528 | $2,749,783 | $2,090,390 | 34.6% |
| CalSTERS | $1,655,844 | $6,103,896 | $2,062,338 | $1,567,792 | 25.9% |
| Yucaipa | $275,974 | $1,017,316 | $343,723 | $261,298 | 4% |
| F.B. Heron | $27,598 | $101,732 | $34,373 | $26,130 | .4% |

CalPERS, NY Retirement Fund, CalSTERS, Yucaipa, and F.B. Heron provided the funds for two

purposes.  Most of the funds were designated for the purchase of church properties.  The

remaining funds were designated for operational expenses, including salaries, office expenses,

and other business-related expenses.

Follieri misused the operational expenses of the venture partnership as if it were his

personal bank account.  Instead of spending the money on business, Follieri diverted the money

to fund an extravagant lifestyle.  Follieri spent the money on flowers, cosmetics, clothes, wine,

expensive dinners, dog walking services, personal vacations for himself, his parents, and his

girlfriend at the time, dental expenses for his father, medical expenses for himself, his parents,

and his then-girlfriend, and Yacht rentals.  As reflected in the Information, Follieri vacationed on

investor money in first-class style.  He chartered private planes, spent thousands on food and

wine and hotels, and traveled around the world.

As time went on, Follieri became emboldened.  In or about 2006, Follieri falsely

represented to the venture partnership that he needed an apartment in New York to house

dignitaries from and build goodwill with the Vatican in order to improve his ability to obtain

9

more properties at discounted rates.  Follieri convinced Yucaipa that the apartment was necessary to house dignitaries who did not want to stay at hotels.  Follieri then used the $37,000 per month apartment on the forty-sixth and forty-seventh floors of a luxury condominium in Manhattan as his personal home.  He told many people that he owned the apartment to further create the false impression that he was a successful real estate developer.

Follieri also made up stories to steal from the venture partnership.  He falsely represented that he had opened an office in Rome, Italy from 2005 through February 2007 when, in fact, no such office existed.  By making up this story, Follieri was able to steal tens of thousands of dollar every quarter and send that money to one of the overseas bank accounts that he controlled.  When confronted by the then-chief financial officer of the venture partnership about the absence of any documentation relating to the office, Follieri directed his administrative assistant to create a false backdated rental contract and phony backdated invoices.  (*See* Gov't Exh. 5).  Follieri also falsely represented that he needed over $800,000 to pay for the engineering reports prepared by the Nephew.  Follieri claimed that the Vatican needed to review these engineering reports before the Vatican could make any decision about whether to sell the properties to Follieri.  In reality, the engineering reports had no engineering-related information, were not sent to the Vatican, were not needed to obtain any approval to purchase properties, and even related to one property that was not owned by the Catholic Church.  When Yucaipa and others repeatedly demanded to see these reports, Follieri came up with excuses as to why these reports were not available and then directed his administrative assistant to create phony, backdated invoices.  (*See* Gov't Exh. 6).

In or about August 2006, Follieri also stole $150,000 from the venture partnership by falsely claiming that the money was needed for an architectural study to build a mausoleum on

church property.  Follieri claimed that Keetdale International—his shell company—had been engaged to prepare the study without disclosing that he controlled this shell company.  In reality, Follieri knew that zoning ordinances precluded him from building a mausoleum on the church property, and Follieri simply diverted the funds to his personal account in Monaco.  In order to conceal his chicanery, Follieri directed his administrative assistant to create a phony, backdated invoice from Keetdale for the architectural study.  (*See* Gov't Exh. 7).

Follieri was able to hide and conceal the nature, source, ownership, and control of the unlawfully obtained proceeds of his crimes by creating shell companies with overseas bank accounts, and superficial consulting agreements between the shell companies that falsely suggested that one company was providing consulting services to another.  Among other shell companies, Follieri created Keetdale International, Solleron International, and Spiral Associates.  There is absolutely no evidence that these companies performed any services.  Instead, the evidence demonstrates that Follieri opened up and maintained overseas bank accounts in the names of these companies, and transferred money from the United States to these accounts and between these accounts to hide the nature, source, ownership, and control of the funds.  (*See*, *e.g.*, Gov't Exh. 8.)  To cover up that he controlled these companies, Follieri created false consulting agreements that improperly suggested that these companies performed services for the Follieri Group.  (*See*, *e.g.*, Gov't Exh. 9.)

## II.  **Follieri's Arrest and Guilty Plea**

On June 24, 2008, Follieri was arrested.  At the time of his arrest, the FBI seized documents reflecting that Follieri was starting a similar fraudulent scheme in Europe called Project Helios/Follieri.  (*See* Gov't Exh. 10).  Follieri also had a document dated May 11, 2008

in his position with the letterhead of Bank Jacob Safra Switzerland stating that Follieri's

corporation, Spiral International, Inc., had in excess of 10 million Euros at the bank.  (*See* Gov't

Exh. 11).  The evidence suggests that this document is fraudulent and that Follieri did not have

10 million Euros at the bank at that time.

As a result of his criminal conduct, on September 10, 2008, Follieri pled guilty to 14

counts, one count of conspiracy to commit wire fraud, eight counts of wire fraud, and five counts

of money laundering.  During Follieri's guilty plea, Follieri admitted the following:

> From 2005 to 2007 . . . I agreed with others to use a portion of the
> money that the investor had placed in the joint venture for purposes
> that – to defraud the investor. . . . .  On the date[s] and in the
> amount[s] stated in Count[s] Two to Fourteen, I wired money from
> the joint venture account in New York to my personal account to
> pay for personal expenses.  I then wired the money to accounts
> controlled by me in Europe so that the origin of the money could
> not easily be traced.  I also wired money from my joint venture
> account in New York to one of the accounts at the Vatican [B]ank
> near Rome to promote my relationship with the Vatican.  I did not
> have the investor authorization to use the money that way.  I knew
> what I was doing was wrong.

(9-10-08 Tr. at 14-15).  Follieri admitted that he knew that the amounts listed in Counts Ten

through Fourteen were the proceeds of his fraudulent scheme.  (9-10-08 Tr. at 16).

Pursuant to a Plea Agreement, the Government and Follieri agreed that the applicable

Guidelines offense level is 24 and that he was in Criminal History Category I.  Follieri

specifically agreed that the loss amount was more than $1,000,000 and that his offenses involved

misrepresentations that he was acting on behalf of a religious organization.  As a result, the

Government and Follieri agreed that the stipulated sentencing Guidelines range was 51 to 63

months' imprisonment, that the applicable fine range was $10,000 to $500,000, that Follieri

agreed to forfeit to the United States a sum of money equal to $2,440,000 in United States

currency, representing the proceeds of his wire fraud and money laundering offenses, and that

Follieri agreed to forfeit all of his right, title and interest in fifty expensive watches and other

jewelry.

In connection with Follieri's sentencing, the Probation Department prepared a PSR which

calculates Follieri's Guidelines offense level as 30 based on findings that the offense involved a

loss amount of $12,918,153.11, that the offense involved 10 or more victims, and that the offense

involved a misrepresentation that Follieri was acting on behalf of a religious organization, calling

for a Guidelines range of 97 to 121 months' imprisonment, and recommending a sentence of 97

months' imprisonment.

At the express request of the Probation Department, the Government provided Probation

with a list of all potential victims.[3]  The Government informed the Probation Department that it

had not completed its investigation with respect to any victims other than the following six

victims:  (1) the New York State Common Retirement Fund ("NY Retirement Fund"); (2) the

California Public Employees' Retirement Fund ("CalPERS"); (3) the California Teachers'

Retirement Fund ("CalSTERS"); (4) F.B. Heron Foundation; (5) The Yucaipa Companies, LLC;

and (6) Monsignor George Tomichek.  In addition, pursuant to its statutory obligations, the

Government notified all of the potential victims of the proceedings in the case.  Although the

---

[3]      Prior to the parties entering into the Plea Agreement, the Government informed
counsel for Follieri that the Government had a statutory obligation to notify all potential victims
of the proceedings in the case and that, if the Probation Department asked for a list of all victims,
the Government would respond completely and truthfully and provide a list of all potential
victims even if the Government's investigation with respect to all such potential victims was not
complete at the time.  With that knowledge, Follieri proceeded to plead guilty pursuant to the
Plea Agreement.  As the parties informed the Court at the time of Follieri's guilty plea, there are
no side agreements or understandings between the Government and Follieri.  The Plea
Agreement contains all of the agreements and understandings between the parties.

Probation Department did not contact any of the potential victims on the Government's list, I understand from the Probation Department that counsel for several individuals contacted the Probation Department and submitted letters to the department.  The Government stands by its plea agreement and the Guidelines calculation in that agreement.  Accordingly, the appropriate Guidelines range is 51 to 63 months' imprisonment.

### Discussion

**I.     Applicable Law**

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").  Indeed, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

Apart from the Sentencing Guidelines, the other factors set forth in Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;

14

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.  *See United States* v. *Crosby*, 397 F.3d at 103.  First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  *Crosby*, 397 F.3d at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate.  *Id*.  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  *Id.* at 113.

15

**II.**   <u>**Analysis**</u>

For the reasons discussed below, Follieri's conduct, weighed in view of the factors set forth in Section 3553(a), warrants a significant sentence of imprisonment.

**A.    The Nature and Circumstances of Follieri's Crimes**

The nature and circumstances of Follieri's crimes warrant a significant term of imprisonment.  Follieri lied to many people over a long period of time.  He lied about his background, his education, and his success.  He lied in all aspects of his life to many people in order to live a life of excess beyond his means.  He deceived and tricked investors into giving him their money, and then diverted that money to himself.  The losses here directly and demonstrably resulted from lies told personally by Follieri to the victims of this fraud.  He committed serious crimes over a long period of time that hurt many people.  Moreover, his misrepresentations about his relationship with the Vatican, and his attempt to take advantage of the Catholic Church and the clergy through these misrepresentations, are serious and warrant significant punishment.

**B.    History and Characteristics of the Defendant**

Notwithstanding the numerous letters submitted to the Court by counsel opining on Follieri's religious values during childhood and good family background, Follieri was enshrouded in dishonesty and deceit while he perpetrated his fraudulent schemes in the United States and elsewhere during the charged period of the conspiracy.  The record shows that he blatantly violated the trust of numerous friends and business associates.  He committed his crimes out of greed and a desire to live a lifestyle like the rich and famous.

16

### 1.      Follieri's Character and Motives

Follieri was motivated by greed.  His character is reflected by his criminal activities and repeated lies over an extension of period of time in the United States and elsewhere.  Follieri suggests that he should receive leniency because he comes from "a old respected family in Foggia" and that his family "has long and enduring ties to the Catholic Church."  (Follieri Memo. at 6-7).  To the extent that Follieri comes from a respected, religious family in Italy, this background does not help him in seeking a reduced sentence.  Unlike narcotics traffickers and violent felons who often come from impoverished families, lack educational and other opportunities, and grow up surrounded by bad influences, Follieri apparently had the background, family values, and education to know better.

### 2.      Follieri's "Charitable" Organization

Follieri's argument that he should receive leniency based on his "charitable" works overlooks that Follieri created his charitable foundation to buttress the false impression that he was a successful businessman and increase his influence with the Catholic Church, and that he used stolen money to fund his charitable organization.  The record reflects that Follieri was not a successful businessman; indeed, other than the money that he obtained through fraudulent representations, Follieri did not have any successful ventures or businesses.  Follieri's claims otherwise are simply lies and part of the false image that he attempted to create for himself. Follieri formed the "Follieri Foundation" during the period of the charged conspiracy, because he wanted to attract investors, perpetuate a false image of success, and increase his influence with the Catholic Church.

17

Follieri told Yucaipa and others that the foundation was a great means through which he could augment his influence with the Catholic Church and hopefully obtain more properties at below-market values.  For example, during the charged conspiracy, on or about November 10, 2006, Follieri distributed a brochure advertising about the success of his real estate business.  In it, Follieri emphasized his "charitable activities of the Follieri Foundation both in the United States and abroad."  (Gov't Exh. 12).  Follieri also tried to recruit, among others, influential political and religious figures to join the board of the foundation.  (*See* Gov't Exh. 13).  For example, in or about February 2006, Follieri asked Cardinal Sodano to join the board, and Cardinal Sodano responded that it would be inappropriate for someone in the cardinal's position to accept Follieri's offer.  (Gov't Exh. 14).  Follieri wanted clergy like Cardinal Sodano to join the board in order to increase his connections with the Vatican so that he could continue to defraud investors into believing that his Vatican ties enabled him to obtain church properties at below-market values.

A good example of Follieri using his charitable efforts to create a false image of his success is a June 25, 2007 e-mail from a public relations firm, whom Follieri hired, to Follieri regarding the distribution of photographs of Follieri's charitable work in Honduras.  (Gov't Exh. 15 (including certain attachments to the e-mail)).  In the e-mail, the public relations firm informed Follieri that the photographs of Follieri and his then-girlfriend doing charitable work in Honduras "went out on the wire services on Friday night."  (Gov't Exh. 15 at 2).  The public relations firm reported that "[a]ccording to UPI over 600 subscribers chose one or more pictures for their publications."  (Gov't Exh. 15 at 2).  It is apparent from this e-mail that Follieri hired the public relations firm to distribute photographs of and generate publicity about his charitable

18

work.  Follieri did not make these charitable contributions solely in the interest of charity, but rather was hoping to take financial advantage of the existence of his foundation.  Indeed, Follieri spent more money hiring public relations firms to extol his virtues than he did making charitable contributions.

Although Follieri cites his donations in Rio de Janeiro and Salvador in Brazil as reflections of his sincere motives to help others, (*see* Follieri Memo. at 9), Follieri omits material information about his motives in making those donations and how he obtained the money to make them.  After Follieri obtained funds provided by the pension funds, charitable organization, and Yucaipa in connection with Yucaipa Follieri Investments LLC, Follieri wanted to expand his "business" of purchasing church properties at below-market values around the world.  Specifically, by in or about 2006, Follieri attempted to start up the same "business" in Brazil.  As a result, in or about July 2006, Follieri and several members of the Follieri Group, including the Nephew of Cardinal Sodano, spent time in Brazil trying to build relationships with the clergy and advertise the Follieri Group's business of purchasing church properties.  On or about July 24, 2006, Follieri stole $105,000 from the pension funds, charitable organization, and Yucaipa in connection with Yucaipa Follieri Investments LLC, and then donated $25,000 by hand-delivering a check from a Yucaipa bank account to the Archbishop of Salvador (Cardinal Angelo) and $85,000 by hand-delivering another check from a Yucaipa bank account to the Archbishop of Rio de Janeiro.  (Gov't Exh. 16).  The recipients of these donations did not know that Follieri had stolen the money to give it to them.  Indeed, it is highly doubtful Cardinal Agnelo of Salvador, Brazil, who wrote a letter in support of Follieri, (*see* Follieri Memo. at 9), would have written the same letter had he known that Follieri used stolen funds to provide his church with a donation.

19

Further, based on the evidence, Follieri appears to have made these donations at the same time that he was seeking the help of church officials in Brazil to purchase properties at below-market values.

To the extent that Follieri really wanted to help others when he made charitable donations with stolen money, by comparison with how Follieri spent stolen funds on an excessively lavish lifestyle, it does not make sense to give Follieri credit for spending a small portion of those stolen funds for charitable projects.  For example, in just a few months at the Olympic Towers apartment in Manhattan where Follieri misused over $37,000 per month of investor money, Follieri spent more stolen money on his monthly rent, live-in butler, and expensive food than he did on any charitable cause.

### 3. Follieri's Family Circumstances

Follieri's argument that his mother's illness warrants a substantial downward variance from the Guidelines range overlooks that Follieri is sadly and solely responsible for his misconduct.  Almost every convicted defendant has an immediate family member, such as a parent, spouse, and/or child, who suffers during the defendant's imprisonment.  An unfortunate part of any criminal sentencing is the impact on a defendant's family, but the defendant himself is, of course, responsible for that harm.  The circumstances confronting Follieri's mother is no different from the circumstances confronting the families of other criminal defendants, and, accordingly, do not warrant leniency for Follieri.

### 4. Follieri's Deportation to Italy

Similarly, while Follieri argues that his deportation should also be considered in that he "will be transferred to a Detention Facility (under conditions far more dire than even the

intolerable conditions he has experienced at the MCC)," (*see* Follieri Memo. at 13), Follieri's

deportation is a common result for aliens convicted of criminal offenses and does not warrant

leniency.  It was Follieri's decision to come to the United States to commit his crimes.  He

presumably could have applied for citizenship while he was here.  As he is in no different

position than the many noncitizens who appear before this Court, we respectfully submit that he

is entitled to no leniency on this basis.[4]

### 5.      Follieri's Vatican Connections

In seeking leniency, Follieri surprisingly submitted photographs of himself with the Pope

and other clergy.  (*See* Follieri Memo. at 11 & Exhs. I1-5).  This is surprising because Follieri

used these same photographs and connections in order to defraud investors and now seeks to use

them in an effort to obtain a reduced sentence.  The Government respectfully submits that

Follieri should not receive any benefit from his purported connections to the Vatican and other

clergy—connections that were the foundation of the fraud that he committed and used to defraud

investors.

---

[4]      At the time of his arrest, Follieri was working in the United States.  Follieri asserts when he was arrested that "his B-1/B-2 Visa [did] not expire until 2010 . . . ."  (Follieri Memo. at 2 n.1.)  In reality, Follieri's B-1 visa issued on November 8, 2000 expired on September 16, 2008.  (*See* Gov't Exh. 17).  A B-1 visitor visa is limited and does not generally allow for gainful employment, labor for hire, or productive activity such as operating a business or consultancy work.  Specifically, a B-1 visitor visa is limited to the negotiation of contracts, consultation with business associates, litigation, and participation in scientific, educational, professional or business conventions, conferences or seminars and other legitimate activities of a commercial or professional nature.  People entering the United States on a B-1 visitor visa are not permitted to work.  Those entering the United States to work must obtain permission to enter as a temporary worker.  Accordingly, Follieri's work in the United States violated the terms and conditions of his B-1 visitor visa.

### 6.      Follieri's Awards

Follieri mistakenly directs the Court's attention to the awards that he received in 2006 and 2007 as evidence that he was a successful entrepreneur.  (Follieri Memo. at 11).  The awards that Follieri received in 2006 and 2007 were the result of the false impressions of success that Follieri created through fraudulent and misleading representations.  Similarly, Follieri misused his appointment as "special consultant to the Pontifical Mission Society," (Follieri Memo. at 11-12 & Exh. K), to falsely assert to certain unwitting investors that he had a formal role at the Vatican when, in fact, this appointment had absolutely nothing to do with the Vatican and did not give Follieri any authority to obtain special access to church properties at below-market values. Follieri also mistakenly suggests that somehow he should receive credit for coming up with a "business model [that] proved successful."  (Follieri Memo. at 11).  Follieri overlooks, however, that his business model was based on false representations and material omissions.  Had Follieri told the truth, it is highly doubtful that investors would have given Follieri access to millions of dollars.  It was only through fraud and deception that Follieri is even able to claim that he was a "success."

### C.      Application of the Sentencing Guidelines

Although no longer binding upon the Court, the United States Sentencing Guidelines represent the considered judgment of the United States Sentencing Commission, a body of experts drawn from all areas of the legal profession, specifically created to determine the appropriate sentence in particular types of cases.  As Judge Lynch has recognized, it is important for "rational judges [to] seek guidance . . . in the collective judgment of their peers and of institutions that have sought to develop a logical structure for guiding their discretion, such as the

22

Sentencing Commission."  *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 426 (S.D.N.Y. 2004); *see also id.* (acknowledging the significance of the Guidelines "as an advisory system of principles that both (1) sets a general level of severity of sentences deemed appropriate by a judicious body of politically-responsible experts, and (2) creates a methodology and enumerates factors to be applied to assess the seriousness of criminal conduct and the severity of an offender's criminal record").  Both the *Booker* and *Crosby* courts stressed the continuing significance of the Guidelines under the new sentencing framework.  In this case, the sentence called for by the Sentencing Guidelines is obviously a significant marker of the seriousness of the offenses committed by Follieri.

      **1.**      **Losses**

In Follieri's sentencing submission, he asserts that the loss amount attributed to Yucaipa (and the pension funds and charitable organization that contributed the capital to the venture partnership with Follieri) is overstated.  (Follieri Memo. at 3).  The Government's calculation of the losses to Yucaipa at the time of the Plea Agreement was accurate and was broken down as follows:

- $911,148 for the phony "engineering reports" that Follieri falsely claimed were necessary to obtain the Vatican's approval prior to the sale of properties;

- $985,857 for unauthorized expenses;

- $600,000 for unauthorized medical expenses;

- $739,000 for private chartered and other flights for vacations;

- $228,000 for non-existent consulting services by Keetdale International; and

- $430,020 for a non-existent Italy office.

The Government's calculations of these losses were conservative and supported by documents, including wire transfers, credit card statements, and bank records.  The Government also determined that Monsignor Tomichek (and in turn the credit card company) suffered a loss of $27,885 as a result of Follieri making unauthorized purchases on Monsignor Tomichek's personal credit card.  The Government further determined that, based on false representations and material omissions, Follieri stole $32,879 from orphaned children in the Philippines who worked at Follieri's direction (through Monsignor Tomichek) to produce gifts that Follieri subsequently distributed to the clergy when Follieri had no intention of paying the orphaned children back any money.

Follieri's argument that the calculated losses to Yucaipa (and the pension funds and charitable organization which provided the capital for the venture partnership) was "more than twice the amount of $1,850,000 calculated by the victim, Yucaipa," (Follieri Memo. at 3), misses the mark.  When Yucaipa filed a civil suit against Follieri seeking $1,850,000, Yucaipa had not uncovered the extent of Follieri's misconduct.  Yucaipa's lawsuit was not based on Follieri's fraudulent and misleading representations regarding his connections with the Vatican and what those connections could produce in terms of exclusive access to below-market church properties. Yucaipa did not appear to know the extent of Follieri's fraudulent conduct.  For example, Yucaipa did not appear to know that Follieri had created phony, backdated invoices to steal money through non-existent consulting services and a non-existent Italy office.  Yucaipa also did not appear to know that Follieri was laundering the money through bank accounts of shell companies that Follieri controlled in various overseas banks.  Accordingly, Follieri's reliance on the amount of money that Yucaipa sought in its civil lawsuit is misplaced and should not be

24

considered.

### 2. Misrepresentation of a Religious Organization

Follieri appropriately received an enhancement of two levels for making misrepresentations on behalf of a religious organization. The principal foundation of Follieri's fraudulent scheme were his misrepresentations about his relationship with and role at the Vatican, and what he could obtain as a result of that alleged relationship and role. These are serious crimes and merit a serious punishment.

### 3. Acceptance of Responsibility

Follieri is entitled to a three-level reduction for his acceptance of responsibility for his guilty plea, having pleaded guilty on the deadline set by the Government on which it would seek an indictment against Follieri and continue its investigation of Follieri's fraudulent schemes. While the Government agrees that Follieri should receive points for acceptance of responsibility, we respectfully submit that Follieri should not receive any additional benefit or variance from the Guidelines range as a result of pleading guilty.

### D. The Need To Afford Adequate Deterrence

One of the factors the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). The Government submits that a significant term of imprisonment is necessary, and indeed vital, to achieve the goals of general deterrence in this case. General deterrence serves an important function and works to prevent financial crimes of the sort committed by Follieri. Given the length of time that Follieri committed his fraud, and the extent to which he flaunted the illegal proceeds of his crime, there is a danger that a short sentence below the

Guidelines range will send the message that the penalties for brazen frauds are not as bad as other crimes and should not be taken seriously.  White collar crimes like the ones committed by Follieri are every bit as heinous and dangerous to the fabric of our society as non-financial crimes.  They should be punished severely and proportionately to the harm that they cause, and people like Follieri who claim to come from privileged backgrounds should not receive a break simply because they have had advantages and opportunities that others have not had in their childhood.  Indeed, if anything, the fact that they were born with every opportunity in the world to succeed means that they do not have any justifiable excuse for their conduct and thus warrant a substantial sentence of imprisonment.

### E.    The Need To Avoid Unwarranted Sentence Disparities

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal sentences.  Although those Guidelines are no longer mandatory, pursuant to Title 18, United States Code, Section 3553(a)(7), the importance of eliminating sentencing disparities remains an important factor which the Court must separately consider.  Given the nature and circumstances of Follieri's conduct in this case, a sentence below the Guidelines range is not warranted.

26

## **Conclusion**

For the reasons explained in this memorandum, the Government respectfully submits that

Follieri should be sentenced a substantial term of imprisonment within the Guidelines range of

51 to 63 months.

Dated:   New York, New York
         October 20, 2008

                                        Respectfully submitted,

                                        LEV L. DASSIN
                                        Acting United States Attorney
                                        Southern District of New York


                                  By:   __/s/ Reed M. Brodsky_____
                                        Reed M. Brodsky
                                        Assistant United States Attorney
                                        (212) 637-2492